[No. E023977. Fourth Dist., Div. Two. Mar. 17, 1999.]

RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL
SERVICES, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
MARY M. et al., Real Parties in Interest.

COUNSEL

William Katzenstein, County Counsel, and Lisya McGuire, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

Janet C. Michaels for Real Parties in Interest.

OPINION

WARD, J.—Petitioner, the Department of Public Social Services of Riverside County (DPSS) seeks a writ of mandate to compel respondent, the superior court, to vacate its order requiring DPSS to provide reunification services to real party in interest Mary M. (Mother) with respect to her son Russell.[1] We find that Mother is presumptively ineligible for services; we reverse the order and remand for further proceedings consistent with this opinion. This decision is based on our conclusion that if a parent's parental rights have been severed as to another child, it is immaterial that the severance occurs after the dependency petition is filed with respect to the subject minor. So long as the severance occurs before the dispositional hearing with respect to the subject minor, services may be denied to the parent.

STATEMENT OF FACTS

A simplified history of the case is all that is required.[2] The minor, Russell M., was born on March 16, 1998, and a dependency petition was filed under Welfare and Institutions Code section 300[3] three days later. In the petition, DPSS alleged that Russell was at risk because his two older siblings were currently dependent children of the court and the parents had failed to correct health and safety hazards in the home. It was also alleged that Mother had not participated in a drug treatment and testing program, evidently as ordered in the existing dependency proceeding.

At a hearing on September 9, 1998, the court made true jurisdictional findings as to Russell. The dispositional part of the proceedings was continued first to October 1, 1998, and then subsequently to October 23.

---

[1]The father is not a party to this petition. The trial court ordered that he be provided services, and DPSS does not contest this order.

[2]Nothing more is possible, in fact, given the scanty factual information in the record. We will sometimes use the terms "evidently" or "apparently" in describing actions or circumstances which are not clearly established in the record, but are not disputed or contested.

[3]All subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

The crux of this case is that at the September 9 hearing, the trial court also held a selection and implementation hearing for Mother's oldest child, Rosemary, with whom she had failed to reunify. At that time, the trial court terminated Mother's parental rights, and a permanent plan of adoption was selected for Rosemary. (§ 366.26, subd. (b)(1).) The trial court also held a 12-month review hearing as to Mother's second child, Rochelle, and terminated reunification services as to her. (§ 366.21, subd. (f).)[4] A selection and implementation hearing was calendared for Rochelle.

When the dispositional hearing was held for Russell in October, DPSS took the position that services should be denied to Mother under two separate provisions of the code. With respect that services should be denied due to Mother's current incarceration[5] pursuant to section 361.5, subdivision (e), DPSS does not contest the trial court's refusal to deny services based on this section.[6] However, DPSS also asked the court to deny services under section 361.5, subdivision (b)(10), and urges on this petition that the trial court erred in finding that the statute did not apply.

DISCUSSION

As a rule, the trial court's selection of a dispositional order for a minor is reviewed only for abuse of discretion. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [57 Cal.Rptr.2d 861].) However, this deferential standard of review does not apply if the trial court plainly misapplies the law.

Section 361.5, subdivision (b) provides that reunification services "need not" be provided to a parent who falls into any of several categories. Among them is subdivision (b)(10), which applies to a parent as to whom "(A) a permanent plan of adoption, guardianship, or long-term foster care" has been ordered for any child after "the parent . . . failed to reunify . . . after the [child] had been removed from that parent . . . pursuant to Section 361 . . . or (B) the parental rights of a parent . . . over any [child] had been permanently severed, and that, according to the findings of the court, this

---

[4]This statute, like several others in the code, was replaced by a section of the same number on January 1, 1999. We cite to the former version, which governed these proceedings. In any event, there are no significant changes in the provisions which apply to this case.

[5]Mother was to serve a 16-month prison term for a drug charge. She had been on probation, but probation was revoked in approximately September 1998.

[6]Section 361.5, subdivision (e) requires the court to order services even for an incarcerated parent *unless* it determines, by clear and convincing evidence, that services would be *detrimental* to the minor. The trial court did not make such a finding.

parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the [child]. . . ." The issue raised by this petition is whether subdivision (b)(10) applies to a parent whose placement within the statute depends on judicial activity which occurs *after* the *current* child is detained. The trial court held that because Mother's rights to Rosemary had not been terminated until *after* Russell was detained, subdivision (b)(10) did not apply to her.

We disagree.

First, we must discuss the authority cited by DPSS, *In re Joshua M.* (1998) 66 Cal.App.4th 458 [78 Cal.Rptr.2d 110]. In that case, the appealing father argued that subdivisions (b)(10) and (12)[7] of section 361.5 could not be applied to him with respect to conduct which occurred before those subdivisions were enacted. As relevant to subdivision (b)(10), the father in *Joshua M.* had had his parental rights terminated as to an older child in 1992, while the current proceedings were held in 1997. The court had no difficulty determining that the cited provisions were intended "to be triggered by prior dependency proceedings or other events occurring before these provisions were enacted." (66 Cal.App.4th at p. 469.) Aptly analogizing to authority applying the "Three Strikes" law (Pen. Code, § 667, subds. (b)-(i)) to convictions occurring before its enactment (see, e.g., *People* v. *Reed* (1995) 33 Cal.App.4th 1608, 1611-1612 [40 Cal.Rptr.2d 47]), the court noted that the effectiveness of the new denial-of-services rules would be delayed and impeded substantially if they could only be applied to conduct occurring after their enactment.[8]

This case does not involve a true retroactivity issue and *Joshua M.* is not directly on point. However, the discussion in that case contains valuable points which direct our analysis.

 We recognize that there has long been a presumption that parents would receive reunification services. Section 361.5, in fact, begins in subdivision (a) by providing that services shall be provided *unless* the parent or parents fall into one of the carefully described exceptions in subdivision (b).

---

[7]Subdivision (b)(12) of section 361.5 governs denial of services to parents with described histories of substance abuse.

[8]For example, subdivision (b)(12) of section 361.5 permits denial of services to a parent with a serious drug problem, but only if the parent has resisted treatment for the problem for *three years*. Thus, if subdivision (b)(12) only applied completely prospectively, it could not be relied upon to authorize denial of services for at least three years after its effective date.

In *In re Luke L.* (1996) 44 Cal.App.4th 670, 678 [52 Cal.Rptr.2d 53], the court commented that "[i]t is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system."[9] However, public resources are not infinite, and although courts have traditionally enforced the obligation to provide services "in spite of the difficulties of doing so or the prospects of success" (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416]), it is also now recognized that "it may be fruitless to offer reunification services under certain circumstances." (*In re Rebecca H.* (1991) 227 Cal.App.3d 825, 837 [278 Cal.Rptr. 185].) That is to say, the courts have recognized that the Legislature has made the decision that in some cases, the likelihood of reunification is so slim that scarce resources should not be expended on such cases.[10] ▆ If the language of the statute permits it, obviously we should adopt a construction which is in accordance with the legislative intent (*People* v. *Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224]) and enhances the ostensible objects to be achieved. (*Conway* v. *City of Imperial Beach* (1997) 52 Cal.App.4th 78, 85 [60 Cal.Rptr.2d 402].)

▆ Here, there is no impediment to a construction of section 361.5, subdivision (b)(10) which permits its application to a parent whose rights to another child are terminated after the subject child is detained but before a disposition of that minor is made. The premise for the subdivision is clear: that a parent who has failed in one course of reunification services, or who has suffered the drastic step of termination of parental rights, is unlikely to succeed with a new round of services. (See *In re Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 478.) The reasonableness of this premise is buttressed by the fact that subdivision (b)(10) does not have any effect unless the state had found it necessary to make the *subject* minor a dependent child too. Thus, built into the statute is not only one prior *completed* parental failure, but a *new, additional* parental failure to provide adequate care. With this in mind, it should make no difference whether Mother's parental rights to Rosemary were terminated in September (as actually happened), or in February (before

[9]In light of the steady multiplication of the section 361.5, subdivision (b) exceptions, it may be questionable how long this comment will hold up. Our analysis of the history of the subdivision indicates that it originally contained five bases on which the court could deny services. Subdivision (b)(6) was added in 1992, and subdivision (b)(7) in 1994. In 1996, a large-scale amendment added subdivision (b) (8) through (12), and subdivision (b) (13) was added in 1997. (See Historical and Statutory Notes, 73 West's Ann. Welf. & Inst. Code (1998) § 361.5, pp. 346-350.)

[10]The favored term for describing such cases seems to be "fruitless." (See *Rebecca H.*, *supra*, 227 Cal.App.3d 825; see also *Deborah S.* v. *Superior Court* (1996) 43 Cal.App.4th 741, 750 [50 Cal.Rptr.2d 858]; *Raymond C.* v. *Superior Court* (1997) 55 Cal.App.4th 159, 163 [64 Cal.Rptr.2d 33]; *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 [73 Cal.Rptr.2d 793]; and *Randi R.* v. *Superior Court* (1998) 64 Cal.App.4th 67, 70 [74 Cal.Rptr.2d 770].)

Russell was detained). The fact is, she has failed to reunify with one child despite the active threat of permanent loss and has failed to make such improvements as would make the subject minor safe in her custody.

Indeed, it could well be argued that a parent who comes under section 361.5, subdivision (b)(10) due to long-past conduct has a *better* argument in favor of services simply on the theory that time may have made him or her more receptive.[11] In a case such as this, there is simply no reason to suppose that Mother, who apparently made no changes in her lifestyle over the two-plus years of Rosemary's dependency, would be any more responsive to a new round of services.[12]

The trial court appears to have been concerned that DPSS's desire to justify denial of services with respect to a subject minor might influence its decision to press for judicial action with respect to *another* minor which would then bring the parent under subdivision (b)(10) of section 361.5. There was discussion at the October hearing over the possibility of "horse races," with the parent demanding a speedy hearing so that services would be ordered before (for example) a permanent plan of adoption was ordered for an older child, or DPSS attempting to delay the dispositional hearing for a subject minor until a terminating order could be obtained for the older child. Due to these concerns, the trial court accepted the argument that the "triggering date" was the filing of the petition with respect to the subject child, so that subdivision (b)(10) would not come into play unless the specified judicial action had been taken with respect to a sibling *before* that date.

Although the trial court's approach appears, at first glance, to have the merit of clarity, it suffers from at least two problems. First, as we have discussed above, it would have the effect of removing from the operation of subdivision (b)(10) of section 361.5 at least some of those parents for whom the statute appears to have been designed. Second, it is based upon an assumption that the department will act in bad faith in rushing to terminate parental rights to other children—an assumption we decline to accept as valid. Furthermore, the trial court's rule would not prevent the effective use of such bad faith tactics; DPSS would only have to press forward to

---

[11]Although any such argument would be to a considerable extent undercut by the fact that the parent was *not* providing adequate care to the current child despite one round of experience with losing a child due to neglect or abuse.

[12]It will be recalled that Mother's experience with DPSS and services after Rosemary was made a dependent did not result in any improvement with respect to her care of Rochelle.

.terminate parental rights to an older sibling *before* filing the petition for the subject minor. If DPSS is determined to pursue ·unjustified terminations of parental rights, or to *unjustifiably* promote permanent plans for other children of the parent, it will not be prevented from doing so simply by making the filing date the "trigger date" for the purposes of subdivision (b)(10).[13]

As a last note on this subject, we point out that even if actions taken after the filing of a dependency petition affect a parent's status under subdivision (b)(10) of section 361.5, it is unlikely that DPSS (or the comparable agency in any county) could routinely use a "tactical" termination of rights or selection of a permanent plan as to a sibling of the subject minor to bring the statute into play. If a minor is detained in custody, the jurisdictional hearing is required to be held within 15 days of the filing of the petition.[14] (§ 334.) Continuances require a showing of good cause. (§ 352.) If the minor is found to be a dependent child, the dispositional hearing is to be held within 30 days if denial of services is an issue. (§ 358, subd. (a)(3).) Thus, if a parent insists upon prompt proceedings, it is not likely that DPSS would be able to rush ahead with a proceeding as to the other child which would bring subdivision (b)(10) of section 361.5 into play, *unless such a* proceeding were already in prospect.[15]

It is true, of course, that in this case the jurisdictional hearing itself was delayed for six months after the filing of the petition. However, the record does not reflect the reason, or reasons, for this delay. We do observe that Rosemary M., Russell's sister, was adjudicated a dependent child in February of 1996 after she had been detained in August of 1995. As the statutory scheme contemplates that in no case will reunification services extend more than 18 months from the time a minor is detained out of the parent's custody (§ 366.21, subd. (g)(1)), it is apparent that Rosemary should have reached the stage of the section 366.26 hearing many months before it was actually

---

[13]Mother attempts to make something suspicious out of the fact that DPSS in this case did not originally recommend a denial of services, but did so only after her parental rights to Rosemary were terminated. There *is* nothing suspicious in this, because until Mother lost her parental rights to Rosemary, there was no legal basis to recommend a denial of services. Similarly, it does not appear that mother was incarcerated until approximately the time of the September hearing, so her incarceration could not have been used earlier as a grounds for denial.

[14]If the minor is not detained, the hearing shall be held within 30 days. However, if DPSS intends to recommend a denial of services, presumably the minor will have been detained.

[15]We also assume that a trial court would look askance at any request by *either* side for either a continuance or an advancement designed solely with section 361.5, subdivision (b)(10) in mind.

held in September of 1998. On the record before us, Mother has no basis for suggesting that DPSS somehow manipulated the time schemes.[16]

Finally, we examine section 361.5, subdivision (b) in all its subparts, and find therein additional support for our conclusion. One of these subparts, (b)(12), *does* contain a specific "triggering date." That is, services may be denied to a parent with a serious drug problem who has "resisted prior treatment for this problem during a three-year period *immediately prior to the filing of the petition that brought that minor to the court's attention. . . .*" (Italics added.) This is logical; it ensures that the provision will not be applied to parents who may have resisted treatment during a three-year period long ago, but who are currently attempting to rehabilitate themselves. But no other subpart contains a specific triggering date, and for many it is apparent that whether or not the subpart becomes applicable before or after the dependency petition is filed should make no difference whatsoever. For example, under subdivision (b)(4), services may be denied to a parent who has caused the death of another child. It could not reasonably be argued that a parent who kills a child *after* a dependency petition is filed on the *subject* minor may nevertheless demand services. Similarly, the court should be able to deny services to a parent who disappears *after* the petition is filed, or to a parent whose mental condition develops to a stage that would render him or her incapable of using services *after* the dependency petition is filed. (§ 361.5, subd. (b)(1) and (2).) In neither case would it make sense to allow such a parent to demand services simply because the statutory bar did not arise until after the dependency petition was filed.[17]

In summary, we hold that subdivision (b)(10) of section 361.5 authorizes the court to deny services to any parent whose rights to another child have been terminated, or who has another child under a permanent plan after reunification efforts have failed. It does not matter whether the described actions were taken before or after the current dependency petition was filed; the only requirement is that they have occurred before a disposition is made in the instant case. The trial court therefore erred in believing that subdivision (b)(10) did not apply to Mother.

---

[16]We are, of course, aware that the strict time frames of the dependency law are honored more in the breach than the observance. However, these time frames are designed to expedite matters and limit the amount of time a minor spends in the "limbo" of foster care before a permanent plan, preferably adoption, can be implemented if the parent fails to reunify. (See *In re David H.* (1995) 33 Cal.App.4th 368, 387-388 [39 Cal.Rptr.2d 313].) Thus, we cannot, and do not, consider the common failure to comply with these limitations to be "normal."

[17]See also section 361.5, subdivision (b)(11), which authorizes the denial of services to a parent who has been convicted of a violent felony, and subdivision (b)(13), which authorizes denial of services if the parent informs the court that he or she does not want them. In the latter case, the subdivision *could not* become applicable until judicial proceedings were commenced and the parent made the necessary concession in court.

That subdivision does not, however, *require* that services be denied, although it certainly creates a provisional bar. Under section 361.5, subdivision (c), services may be offered even to a parent who falls under subdivision (b)(10) if the court finds, by clear and convincing evidence, that it is in the best interests of the *minor* to do so.[18] We therefore direct the trial court to vacate its order compelling petitioner to provide reunification services to Mother, but to consider under subdivision (c) whether the best interests of the minor indicate that services should be offered.

Hollenhorst, Acting P. J., and McKinster, J., concurred.

---

[18]As we have noted above, the record does not permit us to resolve this issue even if we were inclined to attempt to do so.